Austin Dahls, John W. Davis, et al. 22-10663 I'll give y'all a chance to get set up. And, Mr. Isakson, when you get set up, I see that you have four minutes and you're reserving three for rebuttal, and you'll be sharing time with two other lawyers today. That's correct, Your Honor. Thank you very much. May it please the Court, my name is Eric Allen Isakson. I represent the objector and appellant, John W. Davis, in this matter. I intend first to focus on the jurisdictional issues in the case, and I might get into calculation of attorney's fees as well. Mr. Clorey is going to be focusing on the CAFI coupon issues, and Mr. Miorelli is going to focus primarily on the Cypreg issues in the case. On the jurisdictional issues, if you could start by talking about the injunctive relief. I'm happy to start with the injunctive relief. I'm most interested in that. Yeah. The first action, there's I guess four actions altogether. First one was filed in Florida State Court by a fellow named Howland, I think, in response to the filing of that action, Costa de Mar, changed their packaging. They stopped making the representation about a lifetime warranty. They stopped making the representation of the packaging about the nominal fee. After they made those changes, a second plaintiff intervenes in the case. I'm sorry to interrupt. I'm less concerned about the mootness issue than I am about the allegations in the amended class action complaint that we have. And there, as I understand the standing requirement for injunction, to allege an injury for standing, one must show the likelihood or impending and real future injury. Where in this class action complaint, if at all, is there an allegation that there's impending or going to be or likely to be a future injury that would require injunctive relief? I don't think there is, Your Honor. In other words, no one alleged, I'm going to be seeking repairs in the future, I'm going to be buying glasses in the future, my glasses likely will have a defect in the future because they're defective and it's going to break. There's nothing like that, right? That's correct, Your Honor. And no one alleged at the time the first federal complaint was filed, no one alleged the cost it was continuing to engage in the conduct that they contended was violative with respect to the advertising. In other words, this is a classic class action. I was injured in the past because of a defect or misrepresentation that was made and I want to be compensated for that, right? Yes. And with respect to injunctive relief, it would be covered by this court's opinion in Williams v. Reckitt-Benkheiser, the Nariva class action, which was a case that dealt with allegedly misleading packaging and the court, as I understand it, held the name plaintiffs alleged that the packaging was misleading, but there's no way they're going to be misled by the packaging. They don't have Article III standing to seek injunctive relief. The First Circuit reached a similar conclusion in a case called Evenflow. I submitted, I believe, both of those decisions with the Rule 28J letters and you've got the additional problem that their contention is that Costa stopped the conduct that they were engaged in with respect to the packaging on account of the state court action. Once it's stopped, it's stopped. You don't have standing to go file an action in federal court to stop something they already stopped. Let me ask you, to what extent, let's say I agree for the moment that there is a significant standing issue with regard to the injunctive relief component of the ultimate settlement here and the ultimate decision here. How does that affect everything else to the extent that what can be saved and what cannot be saved, if anything? Well, it affects the attorney's fee award. A million dollars is based on the supposed injunctive relief. What about the fairness determination? Mr. Miarelli points out there was no injunction issued. All you've got is the settlement agreement, which is essentially a contract and you can try to enforce its provisions under contract law, but it's not an injunction. There is no injunction. There is no jurisdiction to issue an injunction and the district court in paying attorney's fees on the basis of an injunction that doesn't exist in which there was no jurisdiction to issue was clearly erroneous with respect to the fees. Now, if you want me to talk about Rowland and the MW . . . I would like for you to address, when we have a case where the Magnuson-Moss Warranty Act jurisdictional requirements are not met, does CAFA provide an independent basis for a federal district court to exercise subject matter jurisdiction over a class action that raises only a Magnuson-Moss Warranty Act claim? I believe it does, Your Honor. I believe it does in part because Magnuson-Moss Warranty Act claims, for the most part, mirror or incorporate or federalize state law claims. In most Magnuson-Moss Warranty Act cases, the federal claim has the same elements and the same damages as state law claims. It makes no sense to say that if CAFA confers jurisdiction over a class action asserting the state law breach of warranty claims that somehow Magnuson-Moss Warranty Act revokes jurisdiction over the very same claims. You're saying that CAFA implicitly repeals the MMWA's jurisdictional requirements? It expands jurisdiction. MMWA created a federal cause of action for violations of state warranties and state warranty violations of MMWA's provisions. It's not 100% overlapped with state law. Then the subsection under that says that these claims can be asserted in state courts in the District of Columbia or in federal courts subject to the limitations in subsection 3. They've got an extension of jurisdiction with limitations. The limitations are pretty severe. In 1975, Congress did not want to expand federal jurisdiction dramatically. They didn't want to flood the courts with... Isn't counsel, this is all great, but isn't the easy answer to Judge Branch's question that, let's say this all started in state court. In other words, let's say the Magnuson-Moss prohibition applied and this class action was filed in state court. Then under CAFA, somebody removed it to federal court, which, by the way, is exactly what happened here with regard to the first lawsuit. No, not in this case. That happened in Rellin. This happened... Let's take the hypothetical. It happened in a Texas case. There's four cases. I think it did happen in this case with regard to the first claim that was originally in state court, but okay. In Texas. Yes. Let's assume for the moment that that happened. We wouldn't automatically be divested of jurisdiction from the Magnuson-Moss warranty claim that was originally filed in state court because somebody removed it appropriately to federal court. We would just say that that's a 1367 supplemental jurisdiction claim of state court that we get to tag along to a claim that we do have jurisdiction on, right? I'm not clear on that, to be honest with you, but plaintiffs could defeat the removal if they're not pleading the state law claims in their state court breach of warranty act. Now, in this case, the initial case that was pleaded in Florida was pleaded within an exemption of CAFA. CAFA exempts a case if it's in a state court under the laws of that state, and all of the plaintiffs and all of the defendants are residents of that state or citizens of that state. Mr. Hargitay pleaded his initial complaint in Florida state court to avoid CAFA removal. They later on filed a complaint for Florida Deceptive and Unfair Practices Act claims and a complaint for the Magnuson-Moss warranty act. Which then gave them CAFA jurisdiction to bring it here, right? Well, yes, I think so. I think they've got CAFA jurisdiction. It has to be here. It's a class action. It has to be here on some basis. Yes. Right. I agree. Thank you.  Mr. Kaur, you have four minutes. Good morning. Thank you. I represent the appellant, Austin Valls. If possible, I'd like to just address my abbreviated argument to the coupon issue. CAFA's coupon provision was enacted to address puffing of settlement value with coupons resulting in exorbitant attorney's fees, and that is this case. The court valued the settlement with $27.2 million in unredeemed vouchers, good for Costa Trinkets. We know that most will go unused, and in fact, typical redemption rates for coupons, as we cited in our objection in papers, is between 1% and 3%. What is a coupon? Well, according to the ordinary meaning of the word, and as we've referenced in multiple dictionary definitions, it's a paper or something that entitles you to a discount or to a pre-item, and that's referenced in the Fourth Circuit Opinion of Lumber Day Liquidators. Does the paper part matter? Does the ticket part matter? I don't think so. Depending on which definitions you look at, there may be paper, there may be other definitions of where it says an item, or I certainly don't think that Congress meant to go by the functional equivalent. Exactly. Isn't that the idea? That's the idea. Agreed. How was the claims administrator going to send these out? What is the actual administrative plan for distributing these things? So these vouchers are, you go onto the settlement website, and then you input your data, and then you can spend, 70% of the class members are going to get a single voucher for either. Is it an email they get? So once you sign up on the website, do they send you an email that says, here it is? What indicates that you have this discount? I believe it's an email. If it's going out in printed version, I'm not aware of that. Our colleagues on the other side can answer that question more definitively, but I believe that's correct. It's an email. Does the fact that the district court changed part of this to be a cash component change the fact that this is a coupon settlement or not? Absolutely not. Various circuit courts, slumber liquidators in the Fourth Circuit, I believe Whirlpool and the Ninth Circuit have said a cash throw-in, especially a nominal cash throw-in, doesn't allow attorneys to circumvent the effect of CAFA. If it were, it would gut the purpose of the statute, which is to keep fees tethered to the true value of the coupon. So here, there's supposedly a $27.2 million settlement value with coupons, which enabled the court to reach an $8 million fee. You can't just award $4 million in cash and then justify that as the basis for that kind of fee. Ultimately, what we're likely to have is $800,000 in value for these vouchers, $4 million in court-ordered cash relative to $8 million in attorney's fees. That's exactly the type of scenario that CAFA was enacted to stamp out. The district court believed that it was a close call on whether this is a coupon settlement. You're in this business, right? The objector business? Among other businesses, yes. Do we have, meaning our court, do we have cases on this coupon issue that are currently pending in our court? Yes. The Drazen versus GoDaddy, yes. On this issue, should we stay our hand to wait for the Drazen panel to decide? I've never been asked that. I think that would be an appropriate act to do. I mean, it's the same issue, so yes. But who am I to tell the court that? I just want to ask your thoughts. Fair enough. Any other questions? Thank you, Mr. Coleman. Thank you. Mr. Miarelli? May it please the court, I'm Sam Miarelli, and I'm happy to be here representing my I'm here to address the CyPrae, and the reason why I picked that is because of the five features of the settlement agreement that I think are abusive, I think the CyPrae is the easiest one to understand. Costa never wanted to pay $40 million to settle this case, but anything less wouldn't have justified the $12 million in attorney's fees initially requested. And so that's where the coupons come in, and I think Mr. Klor has done a good job of kind of saying that the coupons are really going to be worth almost nothing. But under a normal case, and what you would normally look at, if you say it's a common fund, well, the common fund has to go somewhere if it's not redeemed, if the check isn't turned in or whatever. Well, in this case, that would have resulted in something like $20 million having to be donated to charity, and that kind of defeats the purpose from a defendant's perspective of getting rid of the case cheaply. And so that's where this million dollar CyPrae limitation comes in, right? We're only up to a million dollars. Now, all the way through in the litigation, everybody assumed that the full million would be paid because everybody knows these coupons never get redeemed, and we even see that when the district court followed MPAS, when the settling parties followed that and took away the $30,000 incentive award, they increased the CyPrae cap by $30,000, with the message to the district court being that we know that it's not good enough just to get rid of the CyPrae. We've got to show that the money's going somewhere. But I thought there's a reversion. In other words, if you're right, and all these folks don't redeem, I thought the money doesn't, as some of these things do, go to the attorneys, it instead goes back to the consumers. Am I wrong on that? So normally, you would do like a second issuance or something like that of additional checks. In this case, the settlement agreement calls for the money to go into the CyPrae, and then that just becomes a marketing donation for COSTA, because bizarrely, the settlement agreement gives the defendant the unilateral right to decide who gets the donation. So the court ultimately reserved authority to itself to approve anything to make sure it was consistent with the purposes. Am I wrong on that? The court said that, but nevertheless, it's the settlement that's the thing that is binding. That's the agreement. The court's supposed to decide that up or down. So I would assume that if the court refused what COSTA wanted to do with the money, COSTA could say, well, then you're not enforcing the settlement agreement, because the settlement agreement as written says COSTA gets to decide. The settlement agreement can be modified, in fact, was modified by the court. And here, it seemed to modify it by saying, I understand what the settlement agreement says. I'm reserving for myself the right to approve this thing to make sure that it's consistent with the purposes for which it was set, right? And I think setting aside the question, I think the court still has to decide up or down. But even setting that aside, the point is the court never looked at why is this thing a settlement unfair? In fact, the court only considered the terms of the side prey in its analysis of the appropriateness of the attorney's fee. But there's no Rule 23E fairness analysis about this or the other four red flags of a collusive deal, where the district court goes, well, I looked at this thing. The objectors brought it to my attention, or I found it on my own. And I still think this is a fair settlement, because there's none of that analysis in this. So even if— I think the court was pretty careful to go through all of the relevant factors. It went through the benefactors, it discussed the factors that are in Rule 23. How can we find that abuse of discretion after having gone through all these factors and concluding in its view that it is fair? Because there's no—there's nothing for the class, Your Honor, to understand why a marketing donation is good for the class in the opinion of the district court. And the Ninth Circuit and the Seventh Circuit and Bluetooth and Southwest Airlines have both said very clearly that the courts aren't allowed to short-circuit the logic. They're not allowed to jump forward to the attorney's fees. They've got to explain if there is one of these collusive terms. And I'll just point out, we've gotten even worse now on appeal, because now Costa says in footnote 8, well, actually, this million dollars is actually nothing. And as we point— It's capped at a million, correct? It's capped at a million, but Costa's briefing suggests it's going to be less than $100,000. And this really gets at the heart of the coupon point now, because now Costa, the defendant, says, well, actually, these vouchers, they expire valueless. Well, if that's the case, then all of these arguments that these things are just as good as cash are really, you know, ridiculous. All right. Thank you. Thank you. Ms. Blank, you have 13 minutes. Thank you. Good morning. My name is Stacey Blank, and I'm here today on behalf of the plaintiff appellees, Mr. Smith, Mr. Haney, and Mr. Reed. Ms. Holliday, counsel for Costa— Would you mind moving that mic down a little farther? Yeah. Is that better? Thank you. Ms. Holliday, who's counsel for Costa and is using two minutes of the time, will address the Cypre issue and respond to any questions about the available products for which the I'd like to take a moment to start with the court's question on the issue of subject matter jurisdiction. There are three possible bases for federal court jurisdiction over a Magnuson-Moss Act claim. There's federal question jurisdiction, there's diversity jurisdiction, and there's supplemental jurisdiction. Can you start with my—can you start with the injunction issue first? Sure. Show me—I have the complaint here. Show me the allegation that establishes what we said in Williams needs to be established, which is a likelihood of future injury. So can I—step one— Push back on anything I said. Okay. I won't push back, but I'm confused by the appellant's argument on this where they say, on the one hand— Don't worry about their argument. We have to establish standing for ourselves. And my issue is, as I understand it, you have to show—you have to quote, establish a threat of real and immediate, as opposed to conjectural or hypothetical, future injury before a court can enter injunctive relief. And so what had happened in this case is that there was a voluntary cessation in the spring of 2018, but just based on the filing of the lawsuit. I'm not worried about mootness. Okay. Don't—forget mootness. I'm talking about standing. Right. I have your complaint. Show me the allegation in the complaint which goes to—and I'll read it again—which establishes a threat of real and immediate, as opposed to conjectural or hypothetical, future injury. And so the allegations in the complaint that describe the conduct with respect to the warranty practices, which Costa was under no obligation to continue to refrain, those allegations— There's no doubt that they would have continued to do it. Correct. I was a plaintiff injured by it in the future in a real and tangible way. Because for those folks who buy new sunglasses, they will, you know, continue to get that. Agreed. Show me where the allegation is that there are folks gonna—one of the plaintiffs is gonna buy new sunglasses. Okay. Not there. Right. There are folks who have already purchased sunglasses who are going to have those sunglasses repaired. Right. Show me where the allegation is that someone is going to have a broken sunglass in the future and need to get a repair. And so I think that is where the allegations about the warranty practices—and maybe it's not as artfully pled as it should have been, but those are the allegations that support the injunctive relief—is that those folks who have sunglasses who submit them for warranty repairs will be exposed to the roughly $12 charge, or if they have repairs necessitated by wear and tear or an other accident, they will be charged something more than a nominal fee. So those are— Show me real and—a real and tangible, a real and immediate future injury that somebody in this class or somebody in the name plaintiffs—and I think it has to be a name plaintiff—is going to have to send it for repairs. Not that it may happen in the future, it's possible it could happen, but that somebody has glasses that are going to break because all the glasses break, and that they are going to have to send it back for warranty or repair. So I think that what I can point to you is that this was the warranty practice, and these are the charges that they charged for folks who submitted glasses for repair. Many of the plaintiffs had multiple glasses, and so that was the continuing threat of harm that was to be addressed by the injunctive component. Now it's interesting to me, if we don't have an injunction—and this is where I was going originally—if the appellant's argument is that no injunction has been entered here, then really this is just non-monetary relief that is a component of the settlement, and the Article III standing doesn't matter because the court hasn't entered an injunction. Well, I thought it has entered an injunction as either part of adopting the settlement or as part of its final judgment. So I think it has approved, at least if you accept the appellant's argument, that there is no enforceable injunction that has been entered. You've just got a contractual remedy that provides non-monetary relief in the form of the agreement to refrain from engaging in these warranty practices. I think the issue is that there's no—I think the issue is there's no standing—the argument is—there's no standing to enter—having entered the injunction, it did enter. And that, to me, is a possible problem. So assume with me for the moment that I agree that there has not been sufficiently alleged a future injury, in fact, that would allow a court to enter an injunction here. It seems to me that part of the fairness determination here was premised on the injunction, and it seems to me that a huge part of the attorney's fees that were entered was also dependent on the injunction. Am I wrong on either of those things? So I think you are wrong on that. I think that the fairness determination can stand independent of the injunctive relief. I think the court looked at each of the components, and of course, at the end of the day, the settlement that was approved by the court was both the voucher component, a cash component of $4 million, and the injunctive relief, which the court really narrowed dramatically from the value suggested by the settling parties down to a $5 million value. And so it became a much smaller component of the settlement, and therefore, I think, a less material aspect in terms of evaluating the overall fairness of the settlement. Likewise, with respect to the fees, the court included in the value of the settlement only the value of the vouchers and the value of the injunctive relief, but there were vastly valuable benefits that were accruing to the class that the court did not consider, including the $4 million of cash, for example. Didn't it access, as part of the value to the class, the value of the injunction? Wasn't that part? It did. It did, at $5 million, at $5 million. And I guess what I'm saying is, on the flip side of that, the court did not consider, as part of the value to the class, $4 million in cash. How can we say that that's not part of the fairness determination if $5 million of a $27 million settlement is valued as it goes away because of a standing problem? It's actually 5 of 32 million, sorry. Because I think what you can say is the court probably should have considered other things in the value of the settlement, including, for example, the $4 million in cash. You may be right. It may be fair at the end of the day, but isn't that for the district court to do, not for us? I mean, we're not going to reweigh all these factors. It's for the district court to say, now this having been knocked out, there may be some other things that make it fair, but I don't see how that's not a major part of what the order that sits in front of us right now. So I do think that even, let's assume for a moment that the court had no ability under Article III to issue the injunction. Let's just assume it's a contractual agreement. The court could have considered the fairness of the settlement just based on the value of the non-monetary relief. That could be considered as part of the fairness determination, and we can understand where the court will come down on that at the end of the day. Because he will say, OK, well, this is non-monetary relief, even if it's just something that is a contractual agreement in the settlement agreement, and it has value, and I have approved it. Why don't you move on to the Magnuson-Moss Warranty Jurisdiction? Sure. So the courts that have considered this issue and have found that CAFA provides an independent basis for jurisdiction recognize that CAFA provides for diversity jurisdiction. Section 1B of the Magnuson-Moss Warranty Act, which talks about district courts, is a federal question jurisdiction statute. Those statutes are not in conflict with each other. They're not at odds with each other. The district courts are courts of competent jurisdiction sitting in a state, and so if CAFA permits a plaintiff to be in federal court under diversity jurisdiction, it would And if Congress had intended to apply those additional jurisdictional restrictions to both diversity claims and federal question claims, it would not have included the language in the statute that says, under this section 1B, which limits those additional jurisdictional requirements to federal question cases only, but not to diversity cases. We know that if you look at this court's decision in the Allen v. Toyota Motor Sales, where the court found that diversity jurisdiction was appropriate under the general diversity statute, not under the MMWA Section 1B, and said, you know, that might be an independent basis for jurisdiction, but we were not required to consult that. If the answer was that CAFA or any other diversity statute, including the regular diversity statute, did not provide a separate and independent basis for jurisdiction, then the court in Allen would have had no choice but to consider whether the plaintiff there satisfied the requirements of the MMWA. It could not have made its determination based on the diversity statute. I will also say that I think your question, Judge Luck, was absolutely right. The simple answer here is that, obviously, the court has supplemental jurisdiction. This is not a standalone MMWA case. The FDUCA case, the Florida Deceptive and Unfair Trade Practices Act case, allowed the court to exercise original jurisdiction under CAFA, and then the court was permitted to have supplemental jurisdiction over the MMWA claim. The original, the case that's on appeal was the Smith case, and in Smith, there was only the MMWA claim, right? I believe that that is . . . The court later permitted the Smith case to be amended to pick up the other cases, which did have state law issues, but Smith itself only had MMWA, correct? Right, and the Reed case is the one that had . . . that was the nationwide FDUCA claim. It satisfied all of the requirements of CAFA and would be the basis for the supplemental jurisdiction. I also want to talk just a moment about the coupon issue. I think the first thing I would say is that this court need not reach the question of what is a coupon settlement or whether the vouchers . . . Is that because the district court, in any event, analyzed the CAFA fairness factors and in any event, applied the CAFA attorney's fee statute to reach the decision that it did? I think that's right, Your Honor. The court applied heightened scrutiny, went through all of the vectors that he was required to go through and at the end of the day said, look, I acknowledge this is a close question and so I'm going to calculate fees as if it's not a coupon settlement, which is what I'm ruling, but I'm also going to do it as if it is a coupon settlement and that's what he did. I don't think the court needs to reach the question in this case. I think if you do reach the question, the court was right. If you look at the appellant's position is that if it's not cash, it must be a coupon. There is nothing in between. Most of the cases who have considered the issue have rejected that there is some tipping point at which . . . and that tipping point is pretty far over in its cash. The Ninth Circuit adopted the three factors and some courts have tweaked those. There are some cases that early on . . . I'm sorry. Your time is up. Thank you very much. I appreciate it. Ms. Holliday, you have two minutes. Thank you. May it please the Court. Sarah Holliday on behalf of the defendant Appellee Costa Del Mar. I just wanted to address a couple of issues that I think were unclear in the briefing or that have been raised here at Euler Argument. The first is on the Cypre issue. I think that it is fairly clear throughout the course of the entire negotiation and then the proceedings with the district court that it was class counsel and Costa's intention that as much value go to the class as possible. In that regard, there was briefing that Judge Corrigan asked for on how to distribute the extra $4 million in cash and what that would do. In that, there was discussion about what that would do to the Cypre. At the end of the day, as Judge Corrigan found, the amount of the Cypre is small and not substantial and he also excluded it from his consideration of attorney's fees. What does happen to the . . . let's say you go through the redemption and only half the people redeem, so the pool is about $27 million, only about half take that, and then there's a second attempt to redeem and you have maybe 10% more who do it. What happens to that money? Under the current settlement agreement, the way that it is written is that the Cypre is calculated after the initial distribution. The reason for that was two practical considerations, Your Honor, was one, just the finality given this was a two-year expiration period, not having to have this sit on the court docket for two years to come back to determine, but the other was a discussion that was had fairly early in the process with the district court at one of the early hearings, which was the fact that from COSTA's perspective, because these type of vouchers, this free product is not something that they do, they don't do gift cards, the residual and also the redemption rate are extremely hard for them to track. The decision was made to try to maximize it on the front end, which is why one of the members would get automatic vouchers as opposed to the opt-in, and I see that my time is running. Thank you. Mr. Isakson, you have three minutes remaining. Thank you, Your Honor. I think a fact of the matter is that if the $27 million in vouchers aren't completely redeemed, the vast majority of which are not likely to be redeemed, COSTA doesn't have to pay anything to anyone. They've got to pay a million dollars to the Cypre, but they're off the hook for millions and millions and millions of dollars, which is why it's not really a common fund, and why coupon principles from CAFA need to apply to it. With respect to the injunctive relief, they've changed the packaging, they've changed the name of the warranty, but they really haven't changed their business practices. The class has benefited not at all from so-called injunction. With respect to CAFA jurisdiction and the Magnuson-Moss Warranty Act, in 1975, with Magnuson-Moss, Congress imposed federal liability for state law warranty breaches, but went with a fairly minimalistic expansion of federal jurisdiction. Thirty years later, Congress in CAFA says, we need to have much broader federal jurisdiction with respect to class actions, and they expanded it dramatically for class actions. They also provided that there are exemptions in Section 1332D9. There's certain kinds of cases that are not covered by CAFA jurisdiction. Section 1332D9, capital A, if the case involves a covered security. Subsection capital B, if the case involves the internal affairs or corporate governance of corporations, and capital C, subsection capital C, if it involves liabilities and duties that relate to securities as defined under the Securities Act of 1933. It doesn't say Magnuson-Moss Warranty Act claims are exempt. If they wanted to exempt Magnuson-Moss from CAFA jurisdiction, they would have exempted those claims as well. So I think that's the reason that there is going to be CAFA jurisdiction. With respect to the coupons, the likely redemption rates are going to be extremely low. I mean, people are going to get these in emails. They're going to look at them as probably junk mail emails. A lot of the emails aren't going to get opened, let alone redeemed. Judge Corrigan recognized when he was trying to decide what to do with attorney's fees and such, he recognized that the great majority of these things are not going to get redeemed. The vouchers are not the same thing as cash, and it is absurd to say that the court applied heightened scrutiny, as would be required by CAFA, given the fact that he attributed them full face value, both with respect to settlement approval and with respect to attorney's fees. He did not do what CAFA required, and when it came to a lodestar, he did not do a real lodestar analysis. I see my time has run. Thank you. Thank you all. We have the case under advisement, and court is in recess until tomorrow morning.